RECEIVED
IN MONROE, LA
FEB 1 6 2006
ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| RICHARD T. MCCORKLE | CIVIL ACTION NO. 03-1262 |
| VERSUS | JUDGE ROBERT G. JAMES |
| MARK SHUMATE, ET AL. | MAG. JUDGE JAMES D. KIRK |

## RULING

Pending before the Court is a Motion in Limine [Doc. No. 12] filed by Defendants. For the following reasons, Defendants' Motion in Limine is GRANTED.

On July 11, 2003, Plaintiff Richard T. McCorkle ("McCorkle") filed this action against Defendants East Carroll Parish Sheriff Mark Shumate ("Shumate") and Deputy Terrance Brown ("Brown"), alleging violations of 42 U.S.C. § 1983 and state law.

In the Complaint, McCorkle states that on June 16, 2003, at approximately 9:30 P.M., he and his girlfriend, Diane Collins ("Collins"), were traveling east on Louisiana Highway 134 in East Carroll Parish, Louisiana, when they were stopped for a traffic violation by Brown. Brown accused McCorkle and Collins of switching seats prior to the stop. McCorkle recounts the pertinent events as follows:

> When McCorkle disagreed with Officer Brown for accusing him of switching places with his girlfriend, the officer became enraged. Officer Brown then ordered McCorkle to "get under the steering wheel." When McCorkle refused, Brown called for backup. When backup arrived, Brown walked around the car, and, as he reached the passenger door, he told McCorkle to step out of the car. Before McCorkle could get the door completely open, Brown dragged McCorkle out of the vehicle, threw him on the ground face down, injuring his knees and shoulder, and handcuffed him, calling him a "Son of a bitch." As McCorkle was attempting to get up, Officer Brown hit him in the left ear, knocking McCorkle over.

Complaint, ¶ 7. McCorkle contends that he suffered loss of hearing in his left ear, as well as pain, anxiety, suffering, and humiliation, because of the actions of Brown.

After his lawsuit was filed, McCorkle took two lie detector tests. The first test was administered on October 2, 2003, by examiner Joseph Oster ("Oster"). The results of that test indicated that McCorkle was untruthful in his assertions that Collins was driving the vehicle before Brown stopped them. A second lie detector test was administered on December 29, 2003, by examiner Tony Plakiotis ("Plakiotis"), who is employed by Oster. The results of that test indicated that McCorkle was truthful when answering "no" to the following questions:

(1) whether he ever had an injury to his left ear prior to June 16, 2003;

(2) whether he was lying when he said Brown struck him on June 16, 2003;

(3) whether he is lying when he states that his ear injury was caused by Brown; and

(4) whether he ever faked an injury to collect money.

McCorkle seeks to have Plakiotis testify at trial and to introduce the results of the December 29, 2003 polygraph examination. Defendants have moved to exclude this testimony and evidence under Rules 702 and 403 of the Federal Rules of Evidence.[1]

### A. *Daubert* Analysis

Following the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), interpreting Rule 702 of the Federal Rules of Evidence, the Fifth Circuit reexamined its previous position that polygraph evidence is per se inadmissible. In *United States*

---

[1] Defendants moved to exclude the testimony of Oster and Plakiotis and the results of both polygraph examinations; however, McCorkle only intends to introduce the testimony and results favorable to him.

*v. Posado*, 57 F.3d 428 (5th Cir. 1995), a panel of the Fifth Circuit held that a per se rule against the admissibility of the results of a polygraph examination was no longer permissible. However, the Fifth Circuit did not "hold that polygraph examinations are scientifically valid or that they will always assist the trier of fact," but "merely remove[d] the obstacle of the per se rule against admissibility, which was based on antiquated concepts about the technical ability of the polygraph and legal precepts that have been expressly overruled by the Supreme Court." *Id.* at 434.

Instead, the Fifth Circuit instructed that the standards announced in *Daubert* control the admissibility of polygraph examination results. In the year 2000, Rule 702 was amended, consistent with *Daubert*, to provide:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise,[2] if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

First, the Court considers whether the proffered testimony is reliable by assessing whether the reasoning or methodology underlying the testimony is scientifically valid. *Daubert*, 509 U.S. at 589. In this analysis, the Court should focus on the expert's principles and methods used, and not on the conclusions generated. Despite the amendment to Rule 702, the non-exhaustive list of factors identified in *Daubert* "remain relevant to the determination of the reliability of expert testimony."

---

[2]Defendants do not attack Plakiotis's qualifications as an expert, but on the reliability of his methods and the relevance of the polygraph examination results under *Daubert* and Rule 702. Thus, the Court assumes that Plakiotis qualifies as an expert in the field of polygraph examination, but must still determine whether his testimony and results are otherwise admissible.

*Guy v. Crown Equipment Corp.*, 394 F.3d 320, 325 (5th Cir. 2004)(citations omitted). The "reliability analysis must remain flexible: not every *Daubert* factor will be applicable in every situation; and a court has discretion to consider other factors it deems relevant." *Id.* Some of the factors the Court might consider include whether the theory or technique that forms the basis of the expert's testimony: (1) can be and has been tested; (2) has been subjected to peer review and publication; (3) has a high known or potential rate of error and standards controlling its operation; and (4) is generally accepted within the relevant scientific or technical community. *Daubert*, 509 U.S. at 593-94.

According to McCorkle, "if there is a qualified, licensed polygraph examiner, no irregularities in the test are established, the finder of fact is admonished that the test is not 100% accurate, the examiner is available for cross-examination, and no irregularities are found in the test, then the results of the examination are admissible." [Doc. No. 37, p. 3].[3] He relies on Plakiotis's deposition testimony to show that it is reliable and that there were no "irregularities." Plakiotis testified that he administered a polygraph examination known as the United States Army Modified General Question Technique ("MGQT"). Plakiotis further testified that during McCorkle's examination he followed the standard procedure for the MGQT by asking relevant and irrelevant questions, and the instrument then measured McCorkle "reactions to the relevant questions." [Doc. No. 12 (quoting Plakiotis's Deposition, p. 12)]. In Plakiotis's opinion, McCorkle's reactions indicate that he was not

---

[3]In support of his conclusion, McCorkle cites this Court to an inapplicable Louisiana Supreme Court case, *Evans v. DeRidder*, 01-2455 (La. 04/03/02), 815 So.2d 61, where it determined that polygraph examinations are admissible in a Civil Service Board hearing. As McCorkle notes, the *Evans* Court made "no ruling on whether a polygraph is admissible in a civil trial." [Doc. No. 37, p. 2]. *Evans* has no bearing on this Court's determination under the Federal Rules of Evidence.

deceptive.

However, Defendants point to a number of factors undermining the reliability of the polygraph examination method employed by Plakiotis. Defendants submitted an affidavit from Doug Williams ("Williams"), a former member of the White House Communications Agency; a graduate of the University of Oklahoma; a graduate of the National Training Center for Lie Detection; a 10-year veteran of the Oklahoma Police Department; and a former member of the United States House of Representatives Office of Technology Assessment. [Doc. No. 36, Exhibit A]. Williams has administered over 6,000 polygraph examinations, testified before the United States House of Representatives in connection with the Federal Polygraph Protection Act, and testified before the Texas legislature regarding the use of polygraph examinations in internal affair investigations.

According to Williams, polygraph examinations are not always accurate and points to the statements of the American Polygraph Association itself. He explains that the polygraph examination attempts to detect false responses by comparing "relevant" questions with "control" questions, which are undeniably true (e.g., such as the date). [Doc. No. 36, Exhibit A]. He opines that control questions do not elicit the same responses as relevant questions. He also opines that an individual can use "countermeasures" to cause himself to render a greater response on control questions, thus causing faulty readings on relevant questions. [Doc. No. 36, Exhibit A]. Such countermeasures "can be completely undetectable by a polygraph examiner." [Doc. No. 36, Exhibit A].

Defendants point out that neither Oster, Plakiotis's employer, nor Plakiotis has ever conducted any independent testing of the methods he uses to determine whether those methods are reliable. Although Oster states that the methods have been tested at the University of Houston, there are conflicting opinions in published literature as to whether such testing is sufficient. Oster and

Plakiotis even disagree about whether the polygraph examination can be "beaten." Plakiotis stated that he "cannot answer" whether someone can "beat" the polygraph examination, but a "pathological liar" has a better chance because such a person "believe[s] everything [he] says." *See* [Doc. No. 37, p. 4 (quoting Plakiotis's Deposition, p. 11)];[Doc. No. 12 (quoting Plakiotis's Deposition, p. 27)]. Oster testified that he did not think a person who lies more in their daily life would have a greater chance of fooling the test. [Doc. No. 12 (quoting Oster's Deposition, p. 63)].

Moreover, Defendants point out the deficiencies with the methods employed by Plakiotis in this case. Plakiotis admitted that he could not calibrate the instrument with a machine designed for that purpose because it was broken, so he could only test it by hand. Prior to beginning the test, Plakiotis did not conduct a simulation in which McCorkle lied intentionally, so that Plakiotis could gauge his reaction. Plakiotis's method is in direct contrast to his employer, Oster, who normally does conduct such a simulation. During the test, Plakiotis observed McCorkle visually without the aid of any methods to determine if McCorkle was using countermeasures, including an activity monitor.

Under these circumstances, the Court finds that the polygraph examination administered by Plakiotis to McCorkle is not sufficiently reliable to be admissible under Rule 702.[4]

**B.    Rule 403**

Even if "polygraph evidence satisfies the requirements of Rule 702 . . .[ot]her evidentiary rules, such as Rule 403, may still operate to exclude the evidence." *Posado*, 57 F.3d at 435. The question of credibility is always for the jury to determine. *See Boyle v. Pool Offshore Co.*, 893 F.2d 713, 717 (5th Cir.1990). McCorkle seeks to offer polygraph testimony and evidence to support his

---

[4]Having reached this conclusion, the Court need not address whether such evidence would be "relevant" under *Daubert*. *See* 509 U.S. at 589 (District courts must act as "gatekeepers" which admit expert testimony only if it is both reliable and relevant.)

truthfulness in this case. The jury would be given the impression that even if McCorkle lied about switching seats with his girlfriend, he is telling the truth when he says that Brown caused his injury on the date of his arrest.

In a case issued shortly after *Posado*, the Fifth Circuit determined that a district court had not abused its discretion in a criminal case by excluding evidence results of a polygraph examination that allegedly supported a defense theory. *See United States v. Pettigrew*, 77 F.3d 1500, 1514 (5th Cir. 1996). In reaching its determination, the Fifth Circuit offered analysis the Court finds pertinent to this case:

> Further, even if the evidence offered by Pettigrew survived the Rule 702 inquiry, the potential for prejudice created by such evidence is high in the absence of appropriate safeguards. In *Posado*, we suggested that an "enhanced role" for Rule 403 may be appropriate in the context of the *Daubert* analysis due to the possible prejudicial effect of polygraph evidence in comparison to its probative value. We identified several safeguards present in *Posado* which operated to counterbalance such prejudice. For instance, the prosecution was contacted before the examination was administered and given the opportunity to participate, and the evidence was not offered at trial before a jury but in a pretrial suppression hearing before a judge who would be less likely to be "intimidated by claims of scientific validity." *Posado*, 57 F.3d at 435. We further observed that the rules of evidence are relaxed in pretrial suppression hearings. *Id.*
>
> None of these safeguards were present in the case before us.

*Id.*

Likewise, in this case, the Court finds that the danger of undue prejudice or confusion is not offset by any counterbalances. This is a jury trial, not a bench trial. If faced with polygraph evidence supporting McCorkle's version of events, the jury could believe that it had to give greater weight to his side of the case in the belief that he had "scientifically" proven that he is telling the truth. In fact, the polygraph examination measures only evidence of McCorkle's personal belief of the truth of his

statements and thus does not provide any factual information for the jury. *See United States v. Ramirez*, No. CRIM. H-93-252, 1995 WL 918083 at * (S.D. Tex. Nov. 17, 1995) (the decision of the district court after remand in *United States v. Posado, supra*). Finally, there are no other special factors in this case which "substantially boost the probative value" of the polygraph examinations. *See Posado*, 57 F.3d at 435-36 (additional considerations which might support admission of polygraph evidence).

Accordingly, even if admissible under Rule 702, the Court finds that the testimony of Oster and Plakiotis and the results of the two polygraph examinations are otherwise inadmissible.

### C. Conclusion

For the foregoing reasons, Defendants' Motion in Limine is GRANTED. The testimony of polygraph examiner Tony Plakiotis and the results of the polygraph examination conducted on December 29, 2003, are excluded from evidence at trial in this matter.

MONROE, LOUISIANA, this __16__ day of __February__, 2006.

ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE